IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | |
|---|---|
| HALL HOUSING INVESTMENTS, INC., ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> 1997 FUND XV SERIES E, LTD., ) <br> ) <br> Defendant, ) <br> ) <br> ───────────── ) <br> ) <br> 1997 FUND XV SERIES E, LTD. and ) <br> GUILFORD REALTY, LLC, ) <br> ) <br> Counterclaimants, ) <br> ) <br> v. ) <br> ) <br> HALL HOUSING INVESTMENTS, INC., ) <br> ) <br> Counterclaim Defendant. ) | CIVIL ACT. NO. 2:22cv186-ECM <br> [wo] |

**MEMORANDUM OPINION and ORDER**

Now pending before the Court are cross motions for judgment on the pleadings. (Docs. 12 & 14).

Plaintiff/Counterclaim Defendant Hall Housing Investments, Inc. ("Hall Housing") filed a complaint in the Circuit Court of Montgomery County, Alabama, bringing one claim for a declaratory judgment. (Doc. 1). The case was removed to this Court on April 20, 2022, on the basis of diversity jurisdiction.

Hall Housing is a corporation incorporated in and having its principal place of business in Alabama. According to the pleadings, the Defendant/Counterclaimant 1997

Fund XV Series E, Ltd. is limited partnership whose partners are citizens of Texas. (Doc. 2 at 3). Counterclaimant Guilford Realty, LLC is owned by members who are citizens of Texas and Delaware. (*Id.*). The value of the asset which is the subject of the declaratory judgment is $884,934.69. The Court finds, therefore, that it has diversity subject matter jurisdiction.

Based upon a review of the record, the briefs, including supplemental briefing ordered by the Court, and the applicable law, and for the reasons that follow, the Defendant/Counterclaimants' motion for judgment on the pleadings is due to be GRANTED and the Plaintiff/Counterclaim Defendant's motion for judgment on the pleadings is due to be DENIED.

## I.     LEGAL STANDARD

Judgment on the pleadings under FED. R. CIV. P. 12(c) is appropriate "when there are no material facts in dispute and the moving party is entitled to judgment as a matter of law." *Douglas Asphalt Co. v. Qore, Inc*., 541 F.3d 1269, 1273 (11th Cir. 2008). To decide a Rule 12(c) motion for judgment on the pleadings, courts apply the same standard applied to Rule 12(b)(6) motions to dismiss. *Johns v. Marsh & McLennan Agency LLC,* 2020 WL 1540397, at *1 (M.D. Ala. 2020). That is, the Court must accept all facts alleged in the complaint as true, viewing them in the light most favorable to the non-movant. *Cannon v. City of West Palm Beach*, 250 F.3d 1299, 1301 (11th Cir. 2001). Conclusory allegations that are merely "conceivable" and fail to rise "above the speculative level" are insufficient. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

## II.     FACTS

The facts as alleged in the pleadings are as follows:

In 1998, a partnership was formed for the purpose of developing and operating Regency Pointe Apartments, a 34-unit affordable housing apartment complex in Foley, Alabama ("the Project"). The partners were Hall Housing, General Partner; 1997 Fund XV Series E, Ltd. ("the 1997 Fund"), Limited Partner; and Guilford Realty LLC, Special General Partner ("Guilford")(collectively, "the Partnership").

The 1997 Fund contributed $1,211,483.00 to the Partnership and received a 99.89 percent equity interest. Hall Housing contributed $100 and received a 0.10% interest. Hall Housing also provided management of the Project in exchange for fees.

Pursuant to the Amended and Restated Certificate and Agreement of Limited Partnership of Foley Hall Apartments, Ltd. II ("Partnership Agreement")(doc. 2-1), the 1997 Fund had a right to order the sale of the project. The 1997 Fund ordered the sale, but because the Partners could not agree on the disposition of the proceeds of the sale, they entered into an agreement on September 30, 2021, which required them to put the funds in escrow. (Doc. 15 at 17-8). The Partnership sold the Project for $1,600,00.00, resulting in $884,934.69 in proceeds being placed in the escrow account.

Hall Housing filed this lawsuit contending that it should receive the majority of the sale proceeds as well as $62,597.03 in reserves, while the 1997 Fund and Guilford contend that sale proceeds should be distributed primarily to the 1997 Fund.

The 1997 Fund and Guilford rely on the following provisions of the Partnership Agreement:

> Section 11.2
> Termination of the Partnership; The Partnership will be terminated upon the happening of any of the following events:
>
> > \* \* \*
>
> > 11.2.3 the disposition or sale by the Partnership of all or substantially all of the Project and distribution of the proceeds of any such disposition or sale . . . .
>
> Section 11.4.1
> Upon termination of the Partnership, its affairs shall be wound up and its assets liquidated as promptly as is consistent with obtaining the fair market value thereof. The proceeds shall be distributed in the order set forth below:
>
> > \* \* \*
>
> > (c) Any unexpended or undistributed amounts thereafter shall be distributed to the Partners in accordance with the Partner's respective positive Capital Account balances after the same have been adjusted to take account of the allocations required by Article XV.

Hall Housing relies on section 16.1.1 of the Partnership Agreement which provides as follows:

> Distributable Cash From Operations. To the extent that Distributable Cash From Operations is available, the General Partner will make distributions to the Partners pursuant to Section 16.2.
>
> > 16.1.1 Distribution of Distributable Cash From Operations for each fiscal year will be made as follows.
>
> > > \* \* \*
>
> > (d) Thereafter, the Distribution of Distributable Cash From Operations shall be made as follows:
>
> > > (i) to the Limited Partner to pay the Special Return;

4

     (ii) to the General Partner to pay any deferred Developer's Fee;
     (iii) to the Limited Partner 20%; and,
     (iv) to the General Partner 80%, as an incentive management fee.

"Cash from Operations" is defined as the "Gross Receipts" of the Partnership for one month, less payments, including payments "to required escrow accounts." (Doc. 2-1 § 2.13 (vi)).

"Gross Receipts" is defined as all revenues received by the Partnership but not "Cash from Sale." (*Id.* § 2.33). "Cash from Sale" means cash from a sale of "all or any part of the Project" but it does not apply to the sale of "all of the project." (*Id.* § 2.15).

## III. DISCUSSION

The parties are in agreement that their dispute can be resolved by the plain language of the Partnership Agreement, but each argues that the Partnership Agreement unambiguously entitles them to a distribution of the proceeds from the sale of the Project in the manner they have claimed in their pleadings.

The 1997 Fund and Guildford take the position that the object of the Partnership Agreement was the apartment building, so when the apartment building was sold, the sale was a liquidation event, and distribution of the sale proceeds is governed by the dissolution, liquidation, and termination section of the Partnership Agreement.[1] In support of this

---

[1] The 1997 Fund also points to the contract provision which states that there is a termination event upon the vote of the limited partner. Because the 1997 Fund invoked this provision in the pleading, the Court gave the parties additional time to address whether this provision applies. Hall Housing argues that there is no evidence that 1997 Fund took any step to hold a vote or plead that such evidence exists. The 1997 Fund and Guilford do not disagree. They argue instead that there was no need to vote to terminate the Partnership because the Partnership terminated with the sale of the Project.

interpretation, the 1997 Fund and Guilford point to various provisions of the Partnership Agreement, including the provision which incorporates the Internal Revenue Code's definition of termination of a partnership.[2]

Hall Housing's view, on the other hand, is that the sale of the apartment was not a termination of the Project because there was no distribution of the sale proceeds. Hall Housing argues that the Partnership Agreement expressly states that there is a termination of the Partnership only when there is a sale of the Project and a distribution, but the sale funds were not distributed here.

Alabama law provides the following rules of contract interpretation:

> Under general Alabama rules of contract interpretation, the intent of the contracting parties is discerned from the whole of the contract. Where there is no indication that the terms of the contract are used in a special or technical sense, they will be given their ordinary, plain, and natural meaning. If the court determines that the terms are unambiguous (susceptible of only one reasonable meaning), then the court will presume that the parties intended what they stated and will enforce the contract as written. On the other hand, if the court determines that the terms are ambiguous (susceptible of more than one reasonable meaning), then the court must use established rules of contract construction to resolve the ambiguity. *See* [*Voyager Life Ins. Co. v.*] *Whitson,* 703 So.2d [944,] 948 [ (Ala.1997) ]. Under those established rules of contract construction, where there is a choice between a valid construction and an invalid construction the court has a duty to accept the construction that will uphold, rather than destroy, the contract and that will give effect and meaning to all of its terms. *See id.* at 948–49; *Sullivan, Long & Hagerty v. Southern Elec. Generating Co.,* 667 So.2d 722, 725 (Ala.1995).

---

[2] The Partnership Agreement provides that the "gross asset value" of Partnership assets is adjusted by the General Partner when there is a termination of the Partnership for federal income tax purposes, pursuant to section 708(b)(1)(B). (Doc. 2-1 at 29).

*Once Upon a Time, LLC v. Chappelle Properties, LLC*, 209 So. 3d 1094, 1097 (Ala. 2016). It is a court's duty to "use 'all efforts to reconcile' contractual provisions." *Vesta Fire Ins. Corp. v. Liberty Nat'l Life Ins. Co.*, 893 So. 2d 395, 405 (Ala. Civ. App. 2003).

The Partnership Agreement at issue here, although long and detailed, is not a model of clarity. For example, according to the first sentence of its definition, "Cash from Sale" applies to sale of "all or any part of the Project," but, according to the last sentence of the same section, does not apply to sales of "all of the Project." (Doc. 2-1 § 2.15).[3]

More pertinent to the parties' dispute is the ambiguity created by the fact that the liquidation and distribution section of the Partnership Agreement applies on its face "[u]pon termination of the Partnership," (*id.* sec. 11.4.1), but "termination" occurs upon the "disposition or sale by the Partnership of all or substantially all of the Project and distribution of the proceeds of any such disposition or sale . . . ." (*Id.* sec. 11.2.3). In other words, while "upon termination" certain distribution rules apply, it is "upon . . . sale" and "distribution" that termination occurs.

There is no definition of "distribution" in the definition section of the Partnership Agreement or in the termination section. The plain and ordinary meaning of "distribute" is "deliver" or "spread out" and "disperse." *Kernel Recs. Oy v. Mosley*, 694 F.3d 1294, 1303, n.10 (11th Cir. 2012)(setting out definitions of "distribute" as "[t]o deliver" or "[t]o spread out; to disperse." *Black's Law Dictionary* 543 (9th ed. 2009) and *Oxford English*

---

[3] Although the 1997 Fund and Guilford alternatively rely on "Cash from Sale" to support their position, for reasons discussed below, the Court finds that another section of the Partnership Agreement governs and so the Court need not reconcile this contract provision.

*Dictionary* Online, http://www.oed.com (June 2012) (defining "distribute" as "[t]o deal out or bestow in portions" and "[t]o spread or disperse abroad")). There also is no definition within the Partnership Agreement of "upon." The 1997 Fund and Guilford cite the Court to dictionary definitions of "upon" as "on" and "thereafter." (Doc. 15 at 8)(citing *Upon Definition,* Merriam–Webster Dictionary, *available at* www.merriam-webster.com/dictionary/upon).

The facts as alleged in this case are that the proceeds from the sale of the Project were not held by the Partnership, but instead were placed in escrow for further appropriate distribution. According to the alleged facts, the money was not paid to the Partners because they could not agree how to divide it, so, by agreement, they delivered the money to an escrow account. To give effect to all of its terms, the Partnership Agreement must be construed to provide for distribution of the proceeds placed in escrow.

Hall Housing's position is that the termination provision does not apply, so some other distribution provision within the Partnership Agreement must apply. Hall Housing contends that the "Cash from Operations" is the applicable provision. "Cash from Operations" provision applies to the sale proceeds, which in turn requires distribution in accordance with section 16.1.1 of the Agreement. Section 16.1.1 provides a method of distributing "Cash from Operations." Pursuant to section 2.13, "Cash from Operations" is the "Gross Receipts" of the partnership, "less" operating expenses, debt service payments, reserves, payments for capital improvements not paid out of reserves, and payments to "required escrow accounts." (Doc. 2-1 sec. 2.13(vi)). According to the express terms of the Partnership Agreement, therefore, "Cash from Operations" does not include money

8

paid into escrow. (*Id.*) The proceeds at issue here were paid into escrow.[4]  Consequently, the sale proceeds are not "Cash from Operations."

As earlier noted, this Court must adopt a construction of the Partnership Agreement that will uphold, rather than destroy, the contract and that will give effect and meaning to all of its terms. *Once Upon a Time, LLC*, 209 So. 3d at 1097.  The construction urged by Hall Housing results in rendering the contract's distribution provisions superfluous, because under Hall Housing's view, the termination provision does not apply, but on its face, neither does the "Cash from Operations" provision.  A construction that gives effect to the distribution terms of the contract is that the sale of the Project and the delivery of the proceeds into escrow was a termination under section 11.2.3, meaning that the distribution rules applicable to a termination apply to the proceeds in escrow.

Even assuming this interpretation, however, Housing argues that distribution of the funds in escrow is still governed by section 16.1.1, resulting in a larger distribution to it, because even when the termination provision of the Partnership Agreement applies, the liquidated assets are distributed under 11.4.1(a), which provides that payment to the General Partner shall be made in accordance with Article XVI, which contains section 16.1.1.

Under the plain language of section 11.4, which is the liquidation and distribution provision of the contract, the "proceeds shall be distributed" in three steps beginning with

---

[4] Although it does not appear that Hall Housing has advanced this argument, to say that paying the money into escrow is not a "required escrow account" within the meaning of the contract is not consistent with the facts alleged, which are that the parties entered into a contract which obligated them to pay the money into escrow.

section 11.4.1(a).[5]  Section 11.4.1(a) is a section which deals with obligations of the Partnership.  Its reference to the General Partner is not in the context of a distribution of assets, but is instead a limitation which provides that if there is a debt to the General Partner, that debt is only to be paid in accordance with Article XVI. (Doc. 2-1 sec. 11.4.1(a)).

The 1997 Fund and Guilford contend that because there is no allegation in the pleadings that Hall Housing was owed any obligation, no distribution is due Hall Housing under 11.4.1(a).  Hall Housing argues in response that because the proceeds of the Project sale are "Cash from Operations," it is due 80% of the proceeds, which is an obligation under section 11.4.1(a). (Doc. 14 at 13).

It appears to the Court that Hall Housing's argument assumes there was a termination, but then disregards the effect of that assumption.  Hall Housing has taken the position that even if there was a termination of the Partnership, distribution is governed by 16.1 by way of 11.4.1 which includes an obligation created by "distribution of Cash from Operations."  But if, as Hall Housing assumes for purposes of its argument, the sale and placement of funds in escrow was a termination of the Partnership, the proceeds from the

---

[5] Section 11.4.1(a) provides that debts and obligations shall be paid first, including the costs of the sale of the Project and that "no payment will be made to the General Partner . . . except as in accordance with Article XVI."  Step two of the distribution--section 11.4.1(b)--allows for retention of assets before distributions to any Partner under 11.4.3.  Section 11.4.3, in turn, says that the Limited Partner shall look solely at the assets of the Partnership for the return of its invested capital and that "if the property or proceeds therefrom remaining after payment or discharge of the debts, obligations and liabilities of the Partnership is insufficient to return its invested capital" its only recourse against the General Partner is as provided within the Agreement.  Section 11.4.1(c) finally provides in step three that unexpended amounts after payment of obligations will be distributed to the Partners in accordance with the Partner's respective positive Capital Account balances after they have been adjusted to take account of the allocations required by Article XV.   Article XV governs the distribution of profits, losses, and credits, which allocates 99.89% to the Limited Partner.

sale definitionally are not "Cash from Operations." Therefore, there is no obligation to Hall Housing to pay it the proceeds of the sale. In other words, if there is a termination, the "Cash from Operations" provision is inapplicable, at least as to the sale proceeds, and no obligation to distribute the sale proceeds to the General Partner is created by that provision. Instead, once the termination provision is applied, distribution is made according to section 11.4.1(c).

The Court's construction of the Partnership Agreement that the sale of the Project and the payment of the proceeds into escrow was a termination requiring distribution under section 11.4.1(c) gives effect to all of the contract terms. This construction also is consistent with other provisions of the Partnership Agreement which contemplate that the Limited Partner would receive a return on its investment. (Doc. 2-1 §15.1 (providing that after various special allocation, gain[6] is allocated "to the Limited Partner until the balance in its Capital Account equals the excess of one hundred fifteen (115%) percent of the Capital Contributions made by the Limited Partner.")). Accordingly, the Defendant/Counterclaimants' motion for judgment on the pleadings is due to be GRANTED.

### IV. CONCLUSION

For the reasons discussed, it is hereby ORDERED as follows:

1. The Defendant/Counterclaimants' motion for judgment on the pleadings (doc. 12) is GRANTED.

---

[6] Gain is defined as the income of the Partnership for federal income tax purposes arising from a sale or other disposition of all or any portion of the Project. (Doc. 2-1 § 2.28).

11

2. The Plaintiff/Counterclaim Defendant's motion for judgment on the pleadings (doc. 14) is DENIED.

A separate Judgment will be entered in accordance with this Memorandum Opinion and Order.[7]

DONE this 19th day of August, 2022.

                        /s/ Emily C. Marks
                        EMILY C. MARKS
                        CHIEF UNITED STATES DISTRICT JUDGE

---

[7] The counterclaims seek damages, but damages have not been established, or even addressed, in the cross motions. Therefore, the Court declines to award damages and will enter only the declaratory judgment sought in the counterclaim. (Doc. 2). While the declaratory relief sought in the counterclaim refers to the General Partner's obligations to distribute funds, the funds are in escrow. The Court also notes that the Escrow Agreement provides that funds can be released only upon Joint Instruction or a non-appealable judgment. As this Court's Final Judgment is appealable only the Joint Instruction provision of their Escrow Agreement would seem to apply. (Doc. 15 at 18).